### GREEN *v*. THE STATE, 28 Miss. Rep., 687.

#### HOMICIDE.

Where the record of the trial of an indictment for murder shows that the grand jury returned into open court an indictment against the defendant for murder with no further description of the indictment, and immediately follows an indictment for murder and the arraignment and plea of defendant, the trial by a jury and other proceedings in the case, all bearing the same style of parties, the same designation of offense, the same number and the same circumstances of identity as the indictment, it is held that the record sufficiently identifies the indictment as that returned into court by the grand jury. A *venire facias* is no part of the record, unless made so by bill of exceptions. 1 How. Miss., 253.

After a party has pleaded in bar to an indictment, and been convicted, it is too late to urge objections to the constitution of the grand jury. Wh. Am. Cr. L., 863; 13 S. & M., 468. Such objections must be pleaded in abatement, or they will be considered as waived. Leathers v. State.

Every homicide is presumed to be murder, until the contrary appears from facts or circumstances proved. Malice is implied from the nature and character of weapon used.

If a party enter into a conflict with a deadly weapon, not intending to use it, but only resort to it in the heat of conflict, and death ensue, the offense is manslaughter. But if he intends from the first to use it, if necessary, to overcome his adversary, and do use it, and kill his adversary, it is murder. And this, although the slayer habitually carried the weapon. The court may modify instructions asked by either party before giving them to the jury. The phrase "great personal injury" in our statutes is equivalent to "great or enormous bodily harm," or danger of loss of life or limb.

Error to the circuit court of Marshall county. R. MILLER, J.

George N. Green was indicted in the circuit court of De Soto county, at the November term thereof, for the murder of William L. Mormon; and subsequently the *venue* was changed to Marshall county, where Green was convicted of murder and sentenced to be hanged.

The facts of the case are in substance, as shown for the state, that a short time previous to the killing, which took place on Sunday, the 19th of September, 1852, Green went to the house of Suddith, who was his neighbor, and asked S. if he had ever heard Mormon say that he had directed Eddings to kill his, G.'s, oxen, and S. replied that he had not; and G. asked S. what he should do, who replied that he could not tell G., and advised him to consult some one who had more knowledge. This conversation took place on Saturday, and S. invited G. to come over to his house on the next day, which was Sunday, with his, G's, nephew, Shultz, who S. wanted to ride a colt; and on Sunday G. and Shultz came; and during the time they were at S.'s house, G. spoke again about the killing of his oxen, and declared that he would have revenge on M., and he would whip Eddings, and during the time G. was at S.'s house, he saw a bowie knife or pistol in G.'s pocket. While G. was at the house of S., Mormon and Eddings came there, and M. and G. spoke to each other rather angrily, and they all remained until after dinner, saying several times he would not eat with such damned rascals, and it was supposed M. heard the remark, as he blushed in the face. Late in the evening M. and Eddings started home, leaving G. at S.'s, and defendant (G.) soon after they left, said he would give a gallon of whiskey, or five dollars, or something for his mule; that he (G.) had a settlement to make with M. and Eddings that evening. S. advised G. that he had better not and to go home; but G. replied that he would drink their hearts' blood; and S. went to water his horses, and while he was gone G.'s mule returned, which had been ridden off by another person; and G. rode up to the fence around the house of Mormon, who was in his cotton patch, and called to M., who went to the fence, and they talked a few minutes, but their conversation was not heard by any others, and as M. was in the act of getting over

the fence, G. jumped from his mule, ran up, and took hold of M., and G. stabbed him several times with his bowie knife; when M. stepped off six or eight steps, sat down, and died in a minute or two. No arms or weapons of any kind were found on M., nor was he seen to have any in the conflict.

Shultz testified for defendant that he was seventy-five or one hundred yards off and did not see the commencement of the difficulty, but when he got to where it took place Mormon had G. down and hold of the hair or back part of his head, and was striking him on the left side, and he saw Eddings running from M.'s house, with a pistol in his hand, towards where the fight took place.

Three or four witnesses testified that they would not believe Shultz on oath, and that they knew his general character for veracity. The opinion of the court contains the instructions objected to by the defendant.

The jury found the defendant Green guilty of murder, and he was sentenced by the court to be hung. The court having refused him a new trial, he prayed this writ of error.

*J. R. Chalmers,* for plaintiff in error.

I. The record does not show affirmatively and distinctly that the bill of indictment found in the papers is the bill of indictment found by the grand jurors against Green. M. S. Opin., Laura v. The State.

II. The court below erred in not arresting judgment, for the following reasons:

1st. It does not appear of record that John Robertson, the foreman of the grand jury, took the oath prescribed as such, in the presence of all the other members of the grand jury. Hutch. Code, 878, 128.

2d. It does not appear of record that the grand jury ever returned the bill of indictment into open court. 3 Gilm. 71; 8 Yerg., 166; 7 Humph., 155; 1 Chit. 324; 2 Stra. 1026.

3d. It does not appear of record that defendant pleaded to the bill of indictment in open court. Rev. Const., art. 1, 10; 8 S. & M., 725.

4th. It appears of record that more than the legal number of persons required to constitute a grand jury were summoned

and in attendance, and that out of these thirty-six were drawn. Hutch. Code, 887, 6, 7; M. S. Opin., Leathers v. State.

III. The court below erred in giving the fifth instruction for the state : " That every killing is presumed to be malicious and amounting to murder, until the contrary appears from circumstances of alleviation, excuse, or justification; and that it is incumbent upon the defendant to make out such circumstance to the satisfaction of the jury, unless they arise out of the evidence produced against him."

Malice is an essential ingredient in murder, and therefore must be clearly proved and not presumed. 1 Russ., 385, 386; 3 Greenl. Ev., 29; Coffee v. State, 3 Yerg., 283; McDaniel v. State, S. & M. 401; 4 Black., 199–201. Burden of proof never shifts in criminal cases. Commonwealth v. Dana, 2 Met., 329; Commonwealth v. Kimball, 24 Pick., 389.

IV. The court, without being requested either by the defendant or the district attorney, gave in modification of the defendant's second, third, sixth and seventh instructions for the defendant, the following, namely : " That if the jury believe from the evidence that the defendant went into the fight having upon his person a deadly weapon, intending from the first to use the same, if necessary to enable him to overcome his antagonist, and did in the fight use the same and kill his antagonist, he is guilty of murder, although he habitually carried the weapon.

" That if the defendant entered into the conflict with a deadly weapon drawn, intending to use it, he is guilty of murder. But if he did not enter into the fight intending to use the weapon, and only resorted to it in the heat of conflict, he is only guilty of manslaughter.

" That by great personal injury the law does not mean slight blows with the fist, or injury by any other means not calculated to endanger the life or limb of the party." State v. Tackett, 1 Hawks, 219; State v. Yarborough, ib., 78; State v. Hill, 4 Dev. & Batt., 491; United States v. Travers, 2 Wheel. Crim. Case, 508; 5 Yerg., 453; 3 Humph., 493.

V. The fifth instruction of the state, " That malice is implied by law from the nature and character of the weapon used; and that the use of a deadly weapon in a fight, and not in ne-

cessary self-defense, is in law evidence of malice." The use of a deadly weapon does not authorize a court to pronounce upon the intent, because an indignity offered to the person, coupled with a breach of the peace, will extenuate a homicide to manslaughter, although a deadly weapon is used. And there may still be a question for the jury, whether it is manslaughter in the first or in a lower degree. State v. Tackett, 1 Hawks, 219; State v. Yarborough, ib., 78; State v. Hill, 4 Dev. & Batt., 491; United States v. Travers, 2 Wheel. Crim. Case, 508; Rex v. Phillips, 2 Cow., 830; Reg. v. Mawgridge, Kelly, 125; ib., 135; Lanure's case, 1 Hall, P. C., 455; Reg. v. Sherwood, 1 Cor. & K., 556; Rex v. Stedman, Foster, 292.

*F. Anderson,* on the same side, made an elaborate argument.

*D. C. Glenn,* attorney-general, in addition to an extended oral argument,

1st. Upon the technical points raised in the argument, I rely on the reasoning of C. J. Henderson, in Kimbrough's case, 2 Dev. N. C. R., 431.

2d. Objections to the constitution of the grand jury. Byrd's case, 1 How., 153; Commonwealth v. Chauncey, 2 Ashm., 90; McQuillen's case, 8 S. & M., 587.

3d. In support of the fifth and sixth charges, I cite State v. Powell, 2 Halst., 244; York's case, 9 Met., 93; C. J. Shaw, and the elementary books and cases cited by him; McDaniel's case, 8 S. & M., 401; 1 Greenl. Ev., 24, 34; 9 Ired., 436; 17 Ala. R., 596.

4th. Right of judge to modify his charges   Cicely's case, 13 S. & M., 202.

5th. In support of third modification, I rely on Oliver's case, 17 Ala. R., 596. The reasoning and the law cited by the court in this case, abundantly vindicate the charge. I invite a careful scrutiny of both. Tackett's case, 1 Hawks, 219, was decided in regard to killing of a slave; and the court says the law is different where the killing of a white man is concerned. I am not prepared to say this is a just or proper distinction. But whether it is or not, it deprives this case of all weight, as an authority in the case before the court.

HANDY, J.:

This was an indictment for murder, in the circuit court of De Soto county, from which there was a change of venue to Marshall circuit court, where the prisoner was tried and convicted of murder. Many objections are urged to the proceedings in the court where the indictment was found, and in the court where the case was tried, as sufficient grounds for reversing the judgment. These objections we will proceed to examine.

*First.* It is said that the record does not sufficiently show that the indictment appearing in the record, is the indictment found by the grand jury against the prisoner. The record contains the following entry:

"No. 400. The State v. George N. Green.

"This day the grand jury, under the care of their proper officer, by the hands of their foreman, John Robertson, returned into open court a bill of indictment against George N. Green, the defendant in this case, for murder, indorsed by the foreman of said grand jury 'a true bill.' "

Then immediately follows the indictment, answering the description of it contained in this entry, and indorsed and numbered in the same manner as the entry. Immediately following is an entry of the case, with the same number and style of parties above stated, showing the arraignment on the indictment and the plea of not guilty. The same circumstances of identity, the number of the case, the style of the parties, and the designation of the offense, appear in various other proceedings taken in the case, until it was removed to Marshall county for trial. If it was not sufficiently certain, from the fact of the indictment immediately following the entry of its return into court by the grand jury, that the indictment thus appearing in the record was the bill found by the grand jury, all reasonable doubt upon the point must be removed by these additional evidences of identity.

*Secondly.* It is insisted that the court below erred in not sustaining the motion in arrest of judgment.

The first ground of this motion is founded on a mistake of fact. It is, that the record does not show that the foreman of the grand jury took the oath prescribed by law in the presence

of the other members of the grand jury. This is distinctly and with all necessary certainty stated in the record.

The second ground is met by a like answer. It is, that it does not appear by the record that the grand jury returned the indictment into open court. The entry above stated shows that this is founded upon a misapprehension of fact, or an improper construction of the language used. The just and fair construction to be given to it is, that the grand jury came into court under the care of their proper officer, and by the hands of their foreman returned the indictment into open court. The third ground of the motion was, that it does not appear that the prisoner pleaded to the indictment in open court, or that the change of venue was ordered in open court. But the record shows quite a different state of facts: that the prisoner was brought to the bar of the court, and arraigned on the indictment, and pleaded not guilty, and on another day he appeared in proper person in court, and on his motion, supported by his oath, etc., the change of venue was ordered. The last ground of the motion was, that it appears by the record that more than the legal number of persons required to constitute the grand jury were summoned and in attendance, and that out of these the grand jury were drawn. This is not a sufficient ground upon which to arrest the judgment. The *venire* did not constitute a part of the record. Byrd v. The State, 1 How., 253. It cannot be noticed unless made a part of the record by bill of exceptions, taken under a proper state of case in the court below. Moreover, after the party has pleaded in bar to the indictment and been convicted, it is too late to urge objections to the constitution of the grand jury by motion in arrest of judgment. Whart. Am. Crim. Law, 863; Brantly v. The State, 13 S. & M., 468. Such objections, being proper subjects for pleas in abatement, will be considered as having been waived, and all benefit of them lost. In the case of Leathers v. The State, relied on in support of this objection, the point was presented by plea in abatement. But numerous decisions of this court, hold that such an objection cannot be supported after a plea in bar and a conviction upon the merits of the case.

The next and principal ground of error insisted upon is, that the instructions of the court upon the law of the case were erro-

neous.  Before considering these instructions, it is necessary to take a view of the evidence in reference to which they were given.

James Suddith, a neighbor of both the deceased and the prisoner, testified, that on Friday previous to the Sunday on which deceased was killed, the prisoner spoke to the witness in relation to the deceased directing Eddings to kill the prisoner's oxen, and consulted him as to what he ought to do ; and witness advised him to consult some one better acquainted with such matters, which he agreed to do.  Witness saw him again on Saturday, and invited him to come over to witness' house on the next day, with prisoner's nephew, John Shultz, whom witness wanted to ride a colt.  They came accordingly, and Shultz rode the colt; and while they were riding out during the day, the prisoner spoke of Eddings having killed his oxen, and said he would have revenge on Mormon and would whip Eddings.  When he stooped witness saw the point of a bowie knife or pistol on him, and he was in the habit of wearing weapons.  When they reached witness' house, they found Mormon and Eddings there, and prisoner and Mormon spoke to each other, the witness thought angrily.  When dinner was ready, witness invited them all to dinner ; the prisoner declined, saying he would not eat with such rascals, using profane language, which Mormon heard. The prisoner then went to the workshop in the yard, and witness went there and again invited him to dinner; but he declined, repeating the abusive language before used.  Late in the afternoon Mormon and Eddings left to go home ; soon after which prisoner said he would give a gallon of whisky or five dollars if he had his (prisoner's) mule ; that he had a settlement to make with Mormon and Eddings, and intended to make it that evening.  Witness advised him not to do so, but to go home.  He replied he could or would drink their hearts' blood.  Witness then parted with him and went some distance to water his horses, and while at the watering place heard a noise in the direction of Mormon's house, and while returning to his house met his wife, who told him that the prisoner had killed Mormon.  When parting with the prisoner, he rode to the watering-place and watered his horses, and returned directly home, the watering-place being

about three-quarters of a mile from witness' house. Prisoner in coming to witness' house, always came by Mormon's house, which was the nearest way.

Andrew J. Eddings testified, that Mormon was killed on the 19th of September, 1852, by the prisoner; that about noon of that day deceased and witness went to Suddith's and found prisoner and Shultz there; prisoner and deceased had some conversation, and seemed friendly. Deceased and witness left there late in the afternoon, prisoner and Shultz remaining. After witness and deceased reached home, prisoner rode up to the fence, and they talked a few moments; witness heard their voices, but not what was said. Deceased was in the act of getting over the fence, and prisoner jumped off his mule and ran up and took hold of the deceased; he drew his bowie knife, which witness saw as he approached deceased, and took hold as deceased got off the fence to the ground. Witness started to them as soon as he heard their voices, and then saw the prisoner draw his knife from his bosom. They struggled together, standing on their feet, and, four or five yards from the fence, prisoner stabbed deceased in the side, who went off six or eight paces, and sat down at the root of a tree, and when witness got to him he was dead. Prisoner ran off after his mule. When prisoner rode up to the fence, he came in a rapid gait, Shultz following about seventy-five or one hundred yards behind him. While the parties were struggling, there was nothing to obstruct witness' view of them. Shultz was some seventy yards from where the fighting took place. Witness did not see the prisoner pressed down and the deceased over him. A misunderstanding had occurred between witness and the prisoner, caused by the witness shooting three of prisoner's oxen that had broken into his cornfield. Deceased was not present when this was done, but he and the prisoner met shortly afterwards, and angry words passed between them. Witness and deceased were cropping together, but the plantation belonged to deceased, and witness lived with him. Deceased and witness had no arms, and there were none about the house; deceased was searched for arms after his death, and he had none about him. He was about twenty-five years of age, and stouter than the prisoner.

McMahan testified, that he knew the premises, and that there was nothing to obstruct the view from the house to the place of killing, and that he saw marks of struggling close to the fence, and the parties seemed to struggle from the fence.

Several witnesses proved that they examined the body after death, and found two wounds on the left side, one in the soft part of his body, just above the hip bone, and the other between his short ribs, sufficient to produce death, and several cuts in the clothes, which did not take effect upon the body.

The prisoner then introduced John Shultz, who testified that he did not see the fight when it began, but saw it about the time it ended; when he came up, that deceased had the prisoner down by the hair on the back of his head, and was striking him in the left side; deceased fell, and prisoner ran off after his mule; saw Eddings come running from the house to them, with a pistol in his right hand and the barrel lying on his left; he put it up before he got over the fence, and he did not get over until the fight was done and prisoner had gone after his mule. Witness was twenty or thirty yards from them when he saw them fighting. When he first heard hallooing he thought it was the prisoner calling him to ride on, he being then about three hundred yards off. He further stated, that when he had first said that he had not seen the prisoner the evening of the killing, he had told a lie, because his grandmother told him to say so, as his uncle, the prisoner, was in danger; but she told him, when sworn, to tell the truth. He did not see any knife in prisoner's hands during the fight, but saw him have the bowie knife presented in court on the same evening, after the fight. Witness was fourteen or fifteen years old.

Four witnesses were introduced by the state, who testified that the witness Shultz was not worthy of credit on oath; one witness for the prisoner, that his character for veracity was tolerably good, and another, that he had never heard it doubted.

This is the substance of all the testimony.

The first instruction given by the court and alleged to be erroneous, is the fifth instruction at the instance of the state, as follows: "That every killing is presumed to be malicious, and amounting to murder, until the contrary appears from the cir-

cumstances of alleviation, excuse, or justification; and that it is incumbent upon the defendant to make out such circumstances to the satisfaction of the jury unless they arise out of the evidence produced against him." The rule here stated is fully justified by the decision of this court in the case of McDaniel v. The State, 8 S. & M., 417,[1] and this instruction is more favorable in its terms to the accused, than the instruction there referred to, with the addition held by the court to be necessary in declaring the true rule. There, the late learned chief justice says, " in cases where the killing is proved and no accompanying circumstances appear in the evidence, the law presumes the killing was done maliciously."

After adverting to other circumstances, affording presumptive evidence of malice, he adds, " These presumptions of law, if unopposed, may amount to full proof of the fact. They stand until the contrary is proved, or until such facts are proved as are sufficient to raise a contrary and stronger presumption." The same principle is sanctioned by courts and jurists of the greatest learning and ability in England and the United States; Commonwealth v. York, 9 Met., 93, and the authorities cited in the learned opinion of Chief Justice Shaw; 3 Greenl. Ev., 14; 1 Stark. Ev., 452. If anything is to be considered as settled by sound judicial reasoning and authority, this doctrine must be so regarded. Exception is also taken to the sixth instruction given at the instance of the state in the following words : " That malice is implied by law from the nature and character of the

[1] 1 Archbold Cr. Pr. & Pl., 846; 1 East P. C., 215; 4 Black. Com., 200; Riley v. State, 9 Humph., 646; Bratton v. State, 10 Humph., 103; Haile v. State, 11 Humph., 154; State v. Lipsey, 3 Dev., 485; State v. Sisson, 3 Brev., 58; State v. Tilley, 3 Iredell, 424; Mitchum v. State, 11 Ga., 615; Boles v. State, 9 S. & M., 284; State v. Town, Wright, 75; Mitchell v. State, 5 Yerg., 340; State v. McFall, Addis., 255; People v. McLeod, 1 Hill., 377; State v. Turner, Wright, 20; McDaniels v. State, 8 S. & M., 401; State v. Tilley, 3 Iredell, 424; Ann v. State, 11 Humph., 159; People v. Kirby, 2 Parker, 78; State v. Johnson, 3 Jones, 266; 1 Hale, 455; 4 Black. Com., 200; 1 Hale, 474; 1 Hawk. P. C., c 29, § 12; 1 East P. C., c 5, § 18; Wharton Am. Cr. Law, 710; Com. v. York, 9 Metc., 93; Foster, 255; 1 East P. C., 340; State v. Peters, 2 Rice Dig., 106; Conner v. State, 4 Yerg., 137; State v. Irwin, 1 Haywood, 112; People v. McLeod, 1 Hill, (N. Y.), 277; U. S. v. Connell, 2 Mason, 91; Com. v. Drew, 4 Mass., 391; Resp. v. Bob., 4 Dallas, 146; State v. Zellers, 2 Halst., 220; State v. Merrill, 2 Dev., 269; State v. Smith, 2 Strobh., 77; Rex v. Martin, 3 C. & P., 211; Rex v. Pitts, C. & M., 284; Rex v. Cheeseman, 7 C. & P., 455; Rex v. Shaw, 6 C. & P., 372: Com. v. Webster, 5 Cush., 320; Riggs v. State, 30 Miss., 635; Wharton on Homicide, 34, 39; Bird v. State, 14 Ga., 43; Price v. State, 36 Miss., 531; Wharton Am. Cr. Law, 710, 944, 1112.

weapon used, and that the use of a deadly weapon in a fight, and not in necessary self-defense, is in law evidence of malice." The general principle contained in this instruction is sanctioned by the authorities above cited.   8 S. & M., 417; 9 Met., 103; and 1 Greenl. Ev., 34; 17 Ala. R., 601; Wharton Am. C. L., 368. But it could not prejudice the accused, because, first it was directed alone to the point of implied malice, whereas the evidence went beyond all reasonable doubt to show express malice. If it could have had any effect upon the minds of the jury, it tended to direct them rather to the implied and uncertain evidence of malice, than to that which was direct and positive to the point.

Secondly. Whatever prejudicial effect might have been occasioned by the instruction as it originally stood, was removed by the instruction subsequently given by the court upon the point of the use of the deadly weapon, as follows: " If the defendant entered into the conflict with a deadly weapon drawn, intending to use it, he is guilty of murder; but if he did not enter into the fight intending to use the weapon, and only resorted to it in the heat of conflict, he is only guilty of manslaughter." " That if the jury believe from the evidence that the defendant went into the fight having upon his person a deadly weapon, intending from the first to use the same if necessary to enable him to overcome his antagonist, and did in the fight use the same and kill his antagonist, he is guilty of murder, although he habitually carried the weapon." These qualifications, and the original instructions, undoubtedly contained a correct statement of the law upon the point embraced by them, and the accused could not have been prejudiced by them. Many other instructions upon both sides were given by the court, which tended still further to declare the whole law applicable to the case in all its bearings, and to prevent any prejudice to the accused. But it is objected in behalf of the prisoner, that the court had no authority to modify charges already given by qualifications and additions. It is the duty of the court to declare the law arising upon the case upon the pleadings and evidence whenever thereto requested by either of the parties. If the law upon any point in the case is incorrectly or imper-

fectly stated by the counsel in asking the instruction, it is the province and duty of the court to declare the law to the jury upon the question as fully as may be necessary to enable them to apply the true rules of law governing the case to the facts submitted for their determination. This power exists whenever the counsel for the parties differ upon any point, or whenever the court is requested to charge the jury upon any point of law arising in the cause; otherwise the main duty and province of the judge would be rendered nugatory. In this case, the points upon which the additional instructions were given by the court, were distinctly presented by the instructions asked by both parties. The court was of opinion, and we think correctly, that those instructions, though generally correct, did not state the law upon the points in question as fully as was necessary under the particular facts of the case, so gave it more fully and distinctly to the jury. We think this was clearly within the power and duty of the court.

The last ground of error insisted upon in behalf of the plaintiff in error, is the following instruction: " That by great personal injury the law does not mean slight blows with the fist, or injury by other means not calculated to endanger the life or limb of the party."

This instruction was given in qualification of the following instruction given at the instance of the accused: " Killing is justifiable when done in lawfully protecting oneself from great personal injury, imminent and designed by another, and there is imminent danger of such design being accomplished."

It is not easy to perceive what proper bearing this last instruction had upon the case presented by the evidence. The evidence showed clearly that the accused having just before expressed his malicious intent against the deceased, went to his abode armed, called him from his employment, and upon deceased answering his call and coming to him, that he met him at the fence, and so soon as the deceased had gotten over the fence, that he drew his bowie knife and commenced the attack upon him. This is fully proved by the witness Eddings, corroborated by the witness McMahan, who testifies that the marks of struggling were close to the fence, and that the struggling

was from the fence.    And this testimony is entirely uncontra-
dicted; for the witness Shultz states that he did not see the
fight when it commenced, but only about the time it ended.
The instruction under this state of facts was a mere abstract
proposition, which had no proper application to the case, and
should have been refused.    But if it could possibly have been
applicable to the case under any proper view of the evidence, it
was proper for the court to instruct the jury as to the import
in law of the terms "great personal injury," and this was
plainly the object and probable effect of the qualification given.
The expression, of itself, is very uncertain and indefinite, and
unless explained and interpreted by reference to the legal prin-
ciples appertaining to the subject, it is not easy to ascertain what
construction might be placed upon the terms by the jury.    Its
uncertainty is well calculated to produce doubt and diversity
of opinion upon it with the jury.    It was, therefore, proper for
the court to define the expression so far as might be necessary to
enable the jury to understand it clearly and to apply it to the
facts of the case, if, in any respect, it could properly have any
application to them.    In doing so, the court appears to have
stated the general rule correctly in reference to the principles
of the common law which the legislature must have had in view
in enacting the statute in which the terms in question are em-
ployed.    Tested by these principles, the terms "great personal
injury" must be understood to be equivalent in import to the
terms "great bodily harm," or "danger of loss of life or limb,"
or "enormous bodily harm," as defined by the rules of the com-
mon law, to constitute a justification or excuse for homicide.
This construction was properly given by the court in this case,
if the point involved could have had any effect upon the case.
If, therefore, the proposition asked in behalf of the accused to
be given in charge to the jury were pertinent to the case, this
qualification was properly added; if it was not pertinent, as we
think was the case, the qualification could do no injury to the
accused; and being a proper modification of a general abstract
rule given at his instance, he cannot complain that the correct
rule was declared by the court.    We have thus examined all
the grounds of error urged in behalf of the plaintiff in error;

VOL. I.—51

and after a careful and patient consideration of them, together with the evidence and all the rulings of the court, we are brought to the conclusion that there is no error in the proceedings and judgment of the court below.

The judgment is, therefore, affirmed.

A petition for a reärgument was filed in this case by the counsel for appellant, but the court refused to grant a reärgument.