## RIGGS *v.* THE STATE, 30 Miss. Rep., 635.

### HOMICIDE.

The statements of a physician, who examined the wounds of the deceased, imme-diately after they were inflicted, although not an eye-witness of the affray—that the wounds were given in the proper county—and the description of, and reference (by other witnesses) to various localities at and near the scene of killing, which were probably familiar to the jury, are sufficient proof of the venue, particularly when no objection is raised on this account at the trial.

A party indicted for murder may be convicted of any degree of manslaughter, that the evidence warrants; but he cannot be convicted of manslaughter, unless the indictment be found within one year next after the offense shall have been committed.

Express malice is evidenced by a previous threat or former grudge; and it is for the jury to determine whether the threat or grudge is established. If the threat be proved satisfactorily to have been made, and afterwards carried into execution, it will be presumed to have been done with a malicious intent, and it is incumbent on the accused, to show circumstances giving it a different character.

Where express malice is shown, and the person against whom the threat or other evidence of malice was made or existed, be afterwards killed with a deadly weapon, by the person harboring the malicious purpose, no mere provocation at the time of committing the act will relieve it of the character of malicious killing, but it is pre-sumed to be in consequence of the previous threat or grudge.

Where a witness is impeached only by one other witness, and such impeaching witness is afterwards contradicted by another witness, it is the peculiar province of the jury to judge which of them are entitled to credit.

Error to Monroe circuit court. HARRIS, J.

James Riggs was indicted in the court below, for the murder of one Joel E. Hunt, which was alleged in the indictment to

have been committed on the 21st day of September, 1852. At
the September term, 1854, of said court, he was tried and con-
victed of murder; a motion for a new trial was made and over-
ruled, and the prisoner sentenced to be hung. A bill of excep-
tions was filed to the judgment of the court, and the case comes
to this court on writ of error.

*W. F. Dowd,* for plaintiff in error.

1. The record nowhere shows that the offense was committed
in Monroe county. John L. Tindall, the only witness who tes-
tified on this subject, was the attending physician; he proved
that Hunt died of the wounds in Monroe county; proved the
character of the wounds inflicted, and says that this conversation
with Hunt occurred in Monroe county, just before his death.
He did not see the fight, and does not pretend to say in what
county the mortal stroke was given. It must be proved either
that the mortal stroke was given in one county, and the victim
died in the county where the indictment was found, or that the
mortal stroke was given, and the victim died in the same county.

At common law, if the offense was committed in one county,
and the victim died in another, the prisoner could not be tried
in either. McGuire v. State, 13 S. & M., 257. The statute
(Poindexter's Code, 314) simply provides, if the offense is com-
mitted in one county, and the death happens in another, the
prisoner must be tried in the latter. 13 S. & M., 257.

Every material circumstance in regard to time and place must
be averred with that degree of certainty, which excludes every
other intendment, and must be proved as laid. Arch. Cr. Plead.,
34, 381; Chitty Cr. Law, 280, 283; Riggs v. State, 26 Miss.,
54; Vaughn v. State, 3 S. & M., 553.

2. The court erred in charging the jury on the application of
the state, that if the jury find that " the killing occurred in the
year 1852, more than twelve months before the finding of the
indictment, they cannot convict the defendant of manslaughter."

The indictment is for murder. Under this indictment, the
jury may find the prisoner guilty of any of the grades of man-
slaughter, without noticing the more aggravated offense. Swin-
ney v. State, 8 S. & M., 584; 2 Hale, P. C., 302; 1 Chitty Cr.

Law, 640.  See also, Howard v. State, 13 S. & M., 261.  Any charge calculated to mislead the jury, that is not practical and altogether safe, is erroneous.  Cicely v. State, 13 S. & M., 202.

3. The second charge is, " express malice is evidenced by a previous threat or former grudge."  This is the foundation of all subsequent charges save one.  Express malice is defined to be " when one person kills another with a sedate, deliberate mind and formed design ; such formed design being evidenced by external circumstances, discovering the inward intention ; as lying in wait, antecedent menaces, former grudges, *and* concerted schemes to do some great bodily harm."  1 Russ. Cr. 482, 483 (5 Am. ed.) ; Anthony v. State, 264.

The jury must judge from all the circumstances, whether there was " a *deliberate, sedate mind,* and formed design to do a great bodily injury."  By the charge given, the jury were precluded from this investigation.  They were told that a single threat, though made in the heat of passion, without deliberation or reflection, which the party may have regretted, and repented of in ten minutes afterwards, is of itself conclusive proof of a *sedate, deliberate mind* and *formed design.*  The charge does not say, that a threat is one of the evidences or proofs of express malice.  But express malice is *evidenced,* that is, *proved,* by a threat,—whatever may be the nature of the threat, or the circumstances under which it was made.  There is no precedent or authority for such a principle.  These instructions taken together, amount to this, that if the prisoner made any threat whatever, it is sufficient proof of express malice, and no provocation whatever will relieve him from guilt,—and taken with the eighth charge—the guilt of murder.

The fourth, fifth and sixth charges are too broad ; the state of facts supposed by each might be true, and yet the prisoner be not guilty of murder.  Roscoe, Cr. Ev. 681 ; 1 Russ., 440.

4. The testimony, at most, only makes out a case of manslaughter.  Hale, P. C., 456 ; Roscoe, Cr. Ev., 737 ; Snow's case, Roscoe, 737, 738 ; Kessell's case, 11 Eng. C. L. R., 441 ; Roscoe, 732, 733 ; 32 Eng. C. L. R., 750.

If the provocation was great, and such as must necessarily have greatly provoked the prisoner, the killing is manslaughter

only.  Preston v. State, 25 Miss., 388 ; Copeland v. State, 7 Humph., 479 ; 2 Archb., 224, 1-2-5.

5. If Riggs had reasonable ground to apprehend a design on the part of Hunt, to commit a felony, or do some great bodily injury, he is excusable.  Dyson v. State, 26 Miss., 362.

*D. C. Glenn*, attorney general.

Argued the case orally, and cited and commented on the following authorities; Wharton Am. Cr. Law, 360, 361, 368, 369 ; State v. Lane, 4 Ired., 113 ; State v. Martin, 2 ib., 10 ; State v. Johnson, 3 ib., 354 ; State v. Telley, 1 ib., 424 ; State v. Hildreth, 1 ib., 429 ; State v. Scott, 4 ib., 409 ; Storter v. the People, 2 Comst., 197, 202.

HANDY, J. :

The plaintiff in error was indicted and convicted in Monroe circuit court, of the murder of one Joel E. Hunt.   A motion was thereupon made in his behalf to set aside the verdict, for several reasons assigned ; which motion was overruled and a bill of exceptions taken, upon which the case is brought here for review.

We will proceed to examine the grounds, upon which it is contended that the judgment should be reversed, in the order in which they are presented by the counsel for the plaintiff in error.

The first of these is, that it does not appear by the record, that the offense was committed in Monroe county, or that it was committed in any other county in this state ; and that the deceased died in Monroe county.

It fully appears, that the deceased came to his death by wounds inflicted by the accused in a combat, which took place between the parties in July, 1852, at the house of one McBeth, some time after supper.   Dr. Tindall testified, that he was called to the deceased about eight o'clock of the night on which the difficulty occurred, and found . him suffering from the wounds inflicted by the accused, of which he died shortly thereafter in Monroe county, in this state.   He describes the wounds, and then proceeds to state the declarations made by the deceased in prospect of death, in relation to the circumstances of the diffi-

culty, and concludes by stating that the deceased lived about fourteen hours, and that he was cut with a large knife, and that "this took place in Monroe county, in this state." It is plain, that this last statement was made for the purpose of proving the *venue*, and that it must be understood as referring to the infliction of the wounds, the calling upon the witness as a physician, the declarations of the deceased, and his death from the wounds. After mentioning all these particulars, the witness concludes by stating that "this took place in Monroe county," thereby clearly referring to all the circumstances previously stated by him. It is true, that he did not witness the infliction of the wounds; but he was called to attend to the wounded man immediately after the occurrence, and might have been able to state with certainty, from the freshness of the wounds or from a knowledge of the house, where the difficulty is shown to have occurred, that it took place in Monroe county.

In the testimony of other witnesses, many references are made to localities connected with the scene of the difficulty, the streets and the house in the town; and especially is the house where the difficulty occurred, described. All these circumstances might have afforded conclusive proof of the place, where the wounds were inflicted, to the jury, who were familiar with these localities, and could not fail to recognize them as being in Monroe county, which render it unnecessary to prove positively before them, that they were located there. That the localities thus shown by the evidence, as well as the testimony of Dr. Tindall, were ample proof of the venue of the offense, to the comprehension of the jury, is clear, from the fact, that no objection was taken in the court below, to the want of proof on that point. The concluding statement of Dr. Tindall was doubtless intended to cover that very point; and in the attitude in which the question appears by the record, we are bound to presume, that the localities mentioned by other witnesses were confirmatory of the statement, that the whole occurrence took place in Monroe county.

This objection is, therefore, no just ground for reversing the judgment.

The next objection is, that the court erred in instructing the

jury, that if they believed, from the evidence, that the killing occurred in the year 1852, more than twelve months before the finding of the indictment, upon which the accused was on trial, they could not convict the accused of manslaughter.

It is objected that, under this instruction, if the jury thought the accused guilty of manslaughter, they would not have been justifiable in finding a general verdict of not guilty, and that it was therefore equivalent to a direct charge to find him guilty of murder. But we do not consider this a just view of the instruction.

The indictment was for murder, charging that the offense was committed more than twelve months before the bill was found. It is well settled, that, under our laws, a party indicted for murder may be convicted of any degree of manslaughter, that the evidence warrants, but that he cannot be convicted of manslaughter, unless the indictment be found within one year next after the offense shall have been committed. The instruction given by the court simply stated this rule. It instructed the jury as to what they could not do, giving no indication as to what they should do. If they thought the accused guilty of manslaughter, but not of murder, it is not to be supposed, that they could have so misapprehended the instruction as to have been led by it to find what they did not consider a true verdict. It is rather to be presumed, that they would have come to the very natural and reasonable conclusion, that, as they were not justified by the evidence in finding him guilty of murder, and could not, under the rule declared to them, find him guilty of manslaughter, there was no alternative but to find him not guilty, generally. The instruction, in effect, presented the plain issue, that the verdict should either be guilty of murder, or not guilty generally. And it can with no more justice be said to indicate to the jury, that they should find the former, than the latter verdict.[1]

[1] In regard to the limitation of criminal prosecutions, the Revised Code of 1857 provides, that, "No person shall be prosecuted for any offense—murder, *manslaughter*, arson, forgery, counterfeiting, larceny, robbery and rape excepted, unless the prosecution for such offense shall be commenced within *two* years next after the commission thereof. *Provided*, that nothing herein shall be so construed as to bar any prosecution against any person who shall abscond or flee from justice in this state, or shall absent himself in this state, or out of the jurisdiction of the court, or so con-

The third error assigned is, the statement in the second instruction, that " express malice is evidenced by a previous threat or former grudge," and the third instruction, that " when a party kills another upon express malice and by the use of a deadly weapon, no provocation, however great, will free the party killing from guilt."

The testimony contained in the record tends to show a previous threat by the accused against the deceased, founded on a grudge entertained by him.

It is unquestionably true, as the court instructed the jury, that a previous threat or a grudge is evidence of express malice, and it goes to fix the character of the killing afterwards perpetrated, unless circumstances be shown to alter or mitigate it, and to relieve it from the imputation of malice.[2] It is for the jury to determine whether the threat or grudge is established; but if proved to their satisfaction to have been made, and the threat be afterwards carried into execution by the party taking the life of his adversary by the use of a deadly weapon, the presumption of law is, that the act was done under a wicked and malicious purpose to destroy him, and it is for the party committing the act to show circumstances giving to it a different character.[3] It is also well settled, that where express malice is shown, and the person against whom the threat or other evidence of malice was made or existed, be afterwards killed with a deadly weapon, by the person harboring the malicious purpose, no mere provocation at the time of committing the act will relieve it of the character of a malicious killing, but it is presumed to be in consequence of the previous threat or grudge. 1 Russ. Cr., 423, 440, 442, (3 Am. ed.) And it is sufficient to give to the threat such effect, if it appear to have been made deliberately, and not from sudden heat of passion; or the killing be done after sufficient time for passion to subside, and reason to be restored.

---

duct himself that he cannot be found by the officers of the law, or that process cannot be served upon him." Page 613, art. 247.

[2] Wray, *Ex-parte,* 30 Miss., 675; Wharton Am. Cr. Law, 727; Moore v. State, 2 Ohio S. R., 500; Jim v. State, 5 Humph., 164; Commonwealth v. Burgess, 2 Va. Cases, 494; Com. v. Smith, 7 Smith's Laws, 697; Com. v. Mulatto Bob, 4 Dallas, 146; 1 Russell on Cr., 482; 1 Hale, 451; 4 Black. Com., 199; 3 Greenl. Ev., 14, 144; 1 Phill. Ev., 476; Rex. v. Greenacre, 8 C. & P., 35.

[3] See cases cited in note (†) *supra.*

As applicable to the testimony in this case upon the point of previous threats, or a grudge on the part of the accused, we perceive no error in the instructions. The rules, as stated, were substantially correct as legal principles, and were pertinent to the testimony upon the points involved in them, that testimony being sufficient to warrant the jury in believing in the existence of a previous threat or grudge.

The last ground of error insisted upon is, that the evidence did not warrant more than a verdict of manslaughter. In order to determine the propriety of this objection, it is necessary to take a view of the substance of the testimony, as it is presented in the record.

The first witness on the part of the state, Dr. Tindall, testifies to the dying declarations of the deceased, giving his statement of the circumstances of the difficulty, which was in substance, that the deceased went to a house and found Riggs there, and asked him where Susan Thomas was, telling him, that he had been using the name of deceased in a manner he would not permit; that the deceased then rose from his chair with a stick in his hand, when the accused struck him with his fists, and the deceased knocked him down twice with a stick; that they fought out of the house into the yard, where the fight terminated; the deceased not knowing that the accused had cut him with a knife, until after the fight had ceased.

This account of the affair is corroborated by the testimony of Emily McBeth, who was present and witnessed the difficulty, and who states some additional particulars. She states, that when the deceased entered the house, he spoke first to the accused, who replied gruffly; that deceased asked the accused where Susan Thomas was, to which he replied by asking if it was any of his business; that an altercation then took place in relation to the woman alluded to, which terminated in the fight; that when some of witness' family remarked, that the deceased was coming, and as he was seen approaching the house, the accused took out his knife and opened it and put it behind him; that when the accused struck the deceased with his fist, the deceased arose from his chair and knocked him down to his knees with his stick. On cross-examination it appeared, that this wit-

ness had no idea of the situation and localities of the house, where the fight took place; that she did not know North from South, or East from West, nor whether the sun rises in the East or in the West, and was exceedingly ignorant. It also appeared that she stated several particulars of the occurrence, differently from what she had stated on her examination before the justice of the peace, when the accused was first arrested and committed, which examination was read for the purpose of discrediting her.

Mrs. A. McBeth testified that she saw the accused at her house on Monday before the killing, and he said that he had been hunting for the deceased the night before, and that he intended the first time he saw him to stick his knife into him mortally; that witness heard a conversation between the accused and Nancy Casey, alias Franklin, in which he charged her with improper intimacy with the deceased, which she denied; but Riggs then made the threat of violence with his knife against the deceased.

Pendleton testified that he saw the accused on the evening of Monday or Tuesday before the killing, inquiring for the deceased at witness' grocery, but nothing peculiar in his manner was observed; the witness suspected nothing.

Strawhan stated that he saw deceased after the killing, and helped to undress him; saw the stick supposed to have been used in the fight; it was a light walking stick; and the deceased had no arms on his person.

Dr. Tindall testified that the deceased had three wounds, one in the right shoulder blade, which witness thinks penetrated the bone; another on the right side cutting the fifth rib in two, and another in the abdomen; that these wounds caused the death.

In behalf of the accused, Nancy Franklin, alias Casey, was introduced, and stated that the deceased had expressed to her his intention to have revenge upon Riggs, for taking Susan Thomas from him; that he afterwards came to Riggs' house, and in the presence of his wife and the witness, in Riggs' absence, said, he intended to kill Riggs, and put him out of the way, and take his wife for his own purposes; that these declarations were made known by Riggs' wife to him, in witness' presence, about a week

before the killing took place.   She denied that she was at Mrs. McBeth's house on Monday or Tuesday before the killing, or that she heard Riggs threaten to stick his knife into the deceased, as stated by Mrs. McBeth, but she states that he said at another time and place, when told that the deceased intended to kill him, that if the deceased attempted to kill him, he would cut him to pieces before he could do it.

Elizabeth Lyons, being called for the state, stated that she heard the last witness repeat the remarks of the accused, and that she did not then say that Riggs had said, that if the deceased attempted to kill him, he would stab him; but that she stated that Riggs, measuring his knife-blade, said, he would put that much of it into the vital parts of the deceased.

It was also proved, by several witnesses, that the accused, when brought before the examining court, refused to state on oath, that he expected to prove by Nancy Franklin, that she communicated to him the threats made against him by the deceased to the wife of the accused and Nancy Franklin.

From this statement of the testimony before the jury, it is manifest that the character of the killing depends upon whether it was done as the result of a previous hostile purpose on the part of the accused; and the determination of that point depends upon the credibility of the witnesses in behalf of the state.   The threats of the accused against the life of the deceased are distinctly proved to have been made by Mrs. McBeth, who also states the cause of his malicious feeling.   This witness is not impeached or contradicted, except by the testimony of Nancy Franklin, whose testimony is impeached by another witness, who proves that Nancy Franklin made statements of the declarations of the accused, different from those deposed to by her on the trial, and in accordance with the testimony of Mrs. McBeth.   It was peculiarly the province of the jury to determine to which of these witnesses they would give credit; and in a case of doubt, we could not say, that they judged improperly upon such a question.[1]   But in this instance, we think that

[1] Where there is conflicting evidence on both sides, and the question be one of doubt, a new trial will not be granted.   Wharton Am. Cr. Law, 3110; Com. v. Gallagher, 4 Penn. Law, 514; Leake v. State, 10 Humph., 144; Com. v. Flannagan, 7 Watts & Serg., 422; Smith v. Hick, 5 Wend., 48; Cassells v. State, 4 Yerg., 152;

the jury were well justified in giving credit to the two witnesses in behalf of the state.

The deadly purpose of the accused is also proved by the testimony of Emily McBeth, showing that when the accused was aware that the deceased was approaching the house, he drew his knife and put it behind him, preparing for the conflict.

The credibility of this witness is strongly assailed, and not without much reason, as her testimony appears in the record. She appears to be ignorant to a degree that would almost lead to the belief that she affected ignorance in order to avoid the scrutiny of a cross-examination, and in some respects she is shown to have made statements in relation to the occurrence, upon the trial, different from those previously made by her before the committing court. These discrepancies, however, are not irreconcilable, and do not affect the most material features of the occurrence, and may be attributed to the ignorance of the witness, or her want of distinctness of recollection, from the lapse of time between the occurrence and the time of her testifying on the trial. Her statement of the circumstances is corroborated by the account given of them in the dying declarations of the deceased, so far as they both speak of the same things, with the exception that she states, that the deceased was sitting in his chair when the accused struck the first blow; and he states that he had risen from his chair with his stick in his hand when the accused struck the first blow. And her statement about the drawing of the knife is distinctly made, both in her deposition before the committing court and in her testimony on the trial. It is corroborated by the fact that it was in accordance with his previous threats, and that he used the knife in the rencounter.

Although this witness does not appear in a very creditable light, either from her gross ignorance or from the discordant

State v. Jim, 2 Bailey, 29; Kirby v. State, 3 Humph., 289; Pleasant v. State, 15 Ark., 624; State v. Lamont, 2 Wisc., 437; Taylor v. State, 4 Ind., 540; Winfield v. State, 3 Iowa, 339; Jerry v. State, 1 Blackf., 395; Douglass v. Tousey, 2 Wend., 352; Jeffries v. State, 3 Murphy, 480; Mortey v. Montgomery, 2 Bailey, 11; Lavall v. Cromwell, Const. R., 593; Stanton v. State, 8 Eng., 339; Bennett v. State, ib., 694; Darby v. Calhoun, 1 Rep. Con. Ct., 398; Miller v. McBurney, ib., 237; Cohn v. Simmons, ib., 446; Caldwell v. Barkley, 2 ib., 452; Roberts v. State, 2 Kelly, 310; Hudgins v. State, 2 ib., 173; Palmer v. Hyde, 4 Conn., 426; Laflin v. Pomroy, 11

statements made by her of some of the features of this occurrence, yet we are not authorized to say that the jury were not justified in crediting her statements in any respect. The delicate and important duty of graduating the credit and weight due to testimony is not only the peculiar province of the jury, because it involves inferences of fact especially intrusted to their judgment, but they have the means of aiding their opinion upon the subject in doubtful cases, which an appellate court does not possess. The witness is personally before them, where they can observe his look and manner, his willingness or hesitation to testify, the feeling or indifference he manifests for either party, the degree of his intelligence, and from all these, as well as the facts stated by him, come to a just conclusion as to the degree of credit or weight to be given to his testimony. All these aids to a just and correct conclusion upon the point are lost in the appellate court. We have nothing but the naked, dry language of the record, which conveys a very imperfect idea, not unfrequently, as to whether the testimony is liable to the objection of ignorance, confusion or corruption in the witness. Hence the rule has been well and wisely established, that an appellate court will rarely, if ever, set aside the verdict of a jury founded upon the credit or discredit given by them to the witnesses on the trial, especially when the testimony is conflicting.

Considering the credit of these witnesses, then, as established by the verdict, it is clear that the killing was perpetrated as the result of express malice, and by the use of a deadly weapon, which the accused had concealed and ready to be used when he entered into the conflict with the deceased. And it is clear, beyond doubt, that the killing, under such circumstances, was murder, and not manslaughter. 1 Russ. Cr., 446, (3 Am. ed.) The judgment is therefore not erroneous on this ground.

We have thus carefully considered all the evidence in the rec-

Conn., 440; Trowbridge v. Baker, 1 Cow., 251; Winchell v. Latham, 6 Cow., 682; McKnight v. Wells, 1 Mo., 13; Clasky v. January, Harden, 539; Nelson v. Chalfant, 3 Litt., 165; Lee v. Banks, 4 ib., 11; Johnson v. Davenport, 3 J. J. Marshall, 390; Reed v. Langford, ib., 420; Creel v. Bell, 2 ib., 309; Talbot v. Talbot, ib., 3; Fitzgerald v. Barker, 4 ib., 398; Swain v. Hall, 3 Wilson, 45; Gregory v. Tuffs, 1 Crom., M. & Rosc., 310; 1 Camp., 450; Melin v. Taylor, 2 Hodge, 125; 3 Bing., N. C., 109; Empson v. Farriford, 1 Will. Woll. & Dav., 10; Stanley v. Wharton, 8 Price, 301; Lofft, 147; Hankey v. Trottman, 1 W. Bla., 1; 2 Price, 282; 1 Burr, 54.

ord, and the various grounds urged for a reversal of the judgment; and we are brought to the conclusion, that there is no error in the record which would justify a reversal of the judgment.

The judgment is, therefore, affirmed.