# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-KA-01393-SCT

*EDGAR RAY KILLEN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/23/2005 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | NESHOBA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | PERCY STANFIELD, JR. |
| | GLEN W. HALL |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JIM HOOD |
| | JOHN R. HENRY |
| DISTRICT ATTORNEY: | MARK SHELDON DUNCAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/12/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE COBB, P.J., DICKINSON AND RANDOLPH, JJ.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     During the night of June 21, 1964, several members of the Neshoba County and Lauderdale County chapters of the White Knights of the Ku Klux Klan (the "Klan") kidnaped and killed Michael Schwerner, James Chaney, and Andrew Goodman, and buried their bodies in an earthen dam in rural Neshoba County, Mississippi. Although the State of Mississippi prosecuted no one during that period of time for the deaths, the federal government brought charges against Edgar Ray Killen ("Killen") and seventeen others for conspiracy to violate the civil rights of Schwerner, Chaney, and Goodman. At the conclusion

of the trial in October, 1967, a federal jury found seven of the defendants guilty and eight not guilty, but it was unable to agree on a verdict as to Killen and two others.[1]  The federal government did not retry Killen, and he remained free for thirty-eight years.

¶2.     In January, 2005, the Grand Jury of Neshoba County indicted Killen for the deaths, and on June 21, 2005 – exactly forty-one years from the date of the deaths – a Neshoba County jury found him guilty of three counts of manslaughter.  Killen was sentenced to serve twenty years for each count, with the three sentences to run consecutively, for a total sentence of sixty years.  Killen appeals.  We affirm.

## I.

¶3.     Killen was indicted and prosecuted forty years following the deaths.  We therefore think it is important to set forth in detail the facts received into evidence at the trial.  Bearing in mind that our authority to interfere with a jury's verdict is limited, we must view the evidence in the light most consistent with the verdict, and we must give the prosecution "the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Wilson v. State*, 904 So. 2d 987, 985 (Miss. 2004) (*citing McFee v. State*, 511 So. 2d 130, 133 (Miss. 1987)).  Consistent with this standard of review, we shall set forth the facts received into evidence[2] in the light most consistent with the jury verdict, and shall include facts

---

[1]Although the federal jury's verdict was not provided to us in the record, it is a historic fact beyond debate, has no bearing on the outcome of this case, and is included herein to provide historic context.  *See  Posey v. United States*, 416 F.2d 545, 548 (5th Cir. 1969).

[2]The evidentiary record consists of sixteen exhibits and the testimony of twenty witnesses, fourteen of whom testified live and six of whom testified through transcripts of their testimony in the 1967 federal prosecution.

inconsistent with the verdict only to the extent necessary to analyze Killen's assignments of error.

*The civil rights struggle in Mississippi*

¶4. During the years leading up to 1964, racial discrimination in Mississippi was rampant and largely unchecked. It was practiced at all levels of state government, and by many citizens, in varying degrees. Most were non-violent, with some silently supporting segregation in the public schools, while others actively and publicly worked through state and local government to keep the races separated in Mississippi's public schools and public accommodations. The White Knights of the Ku Klux Klan, however, was a violent and radical organization, whose members passionately believed that the white race was superior to other races; that integration of the races violated the laws of God and nature; and that educational and social mingling of the races was to be prevented at all costs.

¶5. The Klan was highly structured, with numerous levels of state and local officers who bore curious titles such as "Imperial Wizard," "Kleagle," and "Province Titan." It was also a secret organization whose applicants for membership were required to swear an oath of loyalty, and whose members often donned white robes and placed hoods over their heads with eye holes cut out so they could see while concealing their identity.

¶6. Although the Klan professed lofty principles such as good government, love for America, and allegiance to God, it practiced hatred and violence, and enforced its will through decisions made in secret meetings. The Klan's official policy, which was openly discussed at Klan meetings, was to use whatever force necessary – including harassment,

intimidation, physical abuse, and even murder – to maintain racial and social segregation in Mississippi.

¶7.    In 1870, the Fifteenth Amendment to the U.S. Constitution established that the right of male citizens to vote could not be denied "on account of race, color, or previous condition of servitude," and in 1920, the Nineteenth Amendment extended the same right to women. In 1954, the United States Supreme Court held that African-American children could not be turned away from white schools because of their race.[3]  Nevertheless, in the years leading up to the 1964 murders, Mississippi public schools remained essentially segregated. Few African-Americans registered to vote, resulting in all-white juries[4] and the complete domination by whites of state and local government, including law enforcement.  As a result, the Klan experienced virtually no serious opposition.  Indeed, the Klan included among its members and sympathizers several law enforcement officers who provided both protection against prosecution and the appearance that Klan activities – to some extent – were conducted under color of state law.[5]

¶8.    In the early 1960s, racial tensions were high in Mississippi.  In 1962, James Meredith became the first African-American to register for and attend classes at the University of Mississippi.   The FBI actively investigated numerous civil rights cases in Mississippi,

---

[3]*See **Brown v. Bd. of Educ.**, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954).

[4]Only citizens who are either qualified electors or resident freeholder may serve on juries in Mississippi.  Miss. Code Ann. §13-5-1 (Rev. 2002).

[5]According to the testimony of Delmar Dennis (a witness identified and discussed later in this opinion), Killen stated at a Klan meeting that "any project that was carried out by the Klan had to be approved by the Klan, that no person was to do anything on their own, and if they did, they would not receive any protection or any money or help whatsoever from the Klan."

4

including church burnings in several cities. Many white citizens, however, were unwilling to assist the FBI with civil rights investigations. Special Agent Dean Lytle, who testified at the 2005 trial, described some of the people in Neshoba County in 1964 as "hostile to the federal agents," adding, "they were unhappy we were here . . . ."

¶9. A movement to end the discrimination also emerged during those years. This movement became known as the civil rights movement and, despite the threat of harassment and harm to themselves, many persons – black and white – traveled to Mississippi from around the country to help organize and encourage African-Americans and assist them in registering to vote. These persons – known as civil rights workers – were viewed and labeled by many white Mississippians, including the Klan, as "outsiders" and "troublemakers" who had no business in Mississippi. Some even felt that, should any of the civil rights workers fall victim to the Klan's violence, they had brought it upon themselves.

¶10. It is against this history that Michael Schwerner, James Chaney and Andrew Goodman found themselves working together in the civil rights movement in Meridian, Mississippi, in 1964.

*Schwerner and Chaney in early 1964*

¶11. In January of 1964, Schwerner, who was twenty-four years old, and his twenty-two year old wife, Rita, traveled from their home in New York to Mississippi to work in the civil rights movement. When the Schwerners, who were white, arrived in Meridian, they befriended Chaney, a young African-American, and together they set out to establish a community center to provide African-American teens a safe place to meet and visit, and also to provide African-American children access to books. The public library facilities were

5

segregated and, according to Rita, "the idea was to have a library with books that weren't available in the black library at the time . . . to help children with reading." The Schwerners solicited and received thousands of books for the library, while Chaney built bookshelves and established reading hours for the children.

¶12.   While in Meridian, the Schwerners lived in a variety of places. They would move in as guests of an African-American family, but then be forced to leave when the family received threats. After this process repeated several times, the Schwerners moved into an upstairs apartment which had no running water. Each day, they went to Young's Hotel to shower, but were forced to sneak in the back door because the hotel was owned by an African-American named Young[6] and, according to Rita, they were afraid of what would happen to Young if word got out that he was "allowing whites to use the facilities." In March, a man named George Raymond from Canton, Mississippi, provided the Schwerners a 1963 blue Ford station wagon, bearing license plate number H-25503.

¶13.   The Schwerners were increasingly subjected to threats. Rita received calls telling her she better "watch out" or her husband would be killed. Sometimes the caller would tell her that her husband had already been killed. Despite the threats, the Schwerners continued their work. Rita primarily worked in the community center in Meridian, while her husband and Chaney worked in various places outside Meridian, including Neshoba County.

---

[6]The record identifies this individual only as "Mr. Young."

*The Meridian Klan*

¶14.  Killen, who was the Kleagle[7] for both the Neshoba and Lauderdale County Klaverns, began to recruit new members for the Lauderdale Klavern.  One of his recruits was a Methodist pastor in Meridian named Delmar Dennis.[8]  In March, Dennis attended his first Klan meeting.  In later describing the meeting, Dennis testified that Killen assured him the Klan was a fine, Christian organization, which stood for the American Constitution.  Dennis also testified that Killen said the Klan "was for the purpose of segregation and preservation of the white race."  Dennis testified that, upon his agreement to join the Klan, Killen administered the Klan oath, and then told him the Klan "was an organization of action, no Boy Scout group, that we were here to do business."  Killen further explained that "there would be things the Klan would need to do, and among those would be the burning [of] crosses, people would need to be beaten, and occasionally there would have to be elimination," which Dennis testified meant killing a person.

¶15.  Killen also recruited Carlton Miller, a Meridian police officer, who testified that Killen asked him if he was interested in joining a "strong organization" to "help keep the colored people from integrating [the] schools."  Miller told Killen he was "definitely interested."  Killen returned to the police station that night when Miller got off work, and they went to Miller's home to discuss what Killen referred to as the "organization."  Miller asked if Killen was referring to the Klan.  Miller testified that Killen said he was referring

---

[7]The "Kleagle" was the organizer, or recruiter, for the Klan.

[8]Dennis was to later serve as First Chaplain of the local Klavern, and then as its Province Titan, which was the administrative officer who represented the Imperial Wizard.

to the Klan, and that the Klan "was a very patriotic, political organization, and it was a Christian organization, and in order [sic] that better men and better businessmen and better citizens, officers, doctors, lawyers, and peace officers belonged to it."  Killen asked Miller if he was still interested in joining, and Miller said he was.  Killen then "read some papers" to him, asked him some questions, and administered the Klan oath, and Miller became a Klansman.

¶16.    The following weekend, Killen and Miller went to the Longhorn Drive-In restaurant (the "Longhorn") in Meridian, to recruit its owner, Frank Herndon,[9] and James Jordan, to join the Klan.  After Herndon and Jordan agreed to join, the four men went to a place Miller testified was called "the mountain," where Killen administered the Klan oath.

¶17.    Miller later recruited Meridian police officer Joseph M. Hatcher, who described his first Klan meeting at an old army barracks at the Meridian airport, as follows:

> Sat there, and after a while, here comes somebody,[10] and I thought, oh, my God.  He had on this hood and all of that.  Of course, I had heard about the Klan back in the old days wearing sheets and this and that and the other, and I done forgot what all was said.  You know, told some things about white supremacy and stuff like that, and being a good citizen, and what we was fixing to get into, and I don't remember who took over.

¶18.    Miller said he attended several other Klan meetings at the airport in Meridian.  Other Klan members were present, including "Mr. Barnette" who Miller identified as the ex-sheriff and sheriff-elect of Neshoba County.  At one of those meetings, Miller testified that Killen explained the Klan's methods of "controlling Negro citizens in the State of Mississippi."

---

[9]Herndon was found not guilty in the 1967 federal trial.

[10] Hatcher later identified the "somebody" as Killen.

8

Killen said pressure was to be applied at various levels, starting with threatening telephone calls and other threats "on their jobs and things of that nature." If the Klan didn't get the desired response, they resorted to the next level, which was physical pressure, such as whippings and beatings. This level of pressure required a vote by the lodge. Killen told Miller that, if the threats, pressure, whippings, and beatings didn't work, the Klan would implement the third level, which was "elimination." When asked what elimination meant in the Klan, Miller testified, "Murder." Any request for an elimination was presented to the lodge for approval and, if approved, was turned over to the Kleagle who, at that time, was Killen. The Kleagle would then seek approval for the proposed elimination from the Imperial Wizard,[11] who Miller said was Sam Holloway Bowers.[12]

¶19. Members of the Klan in Lauderdale and Neshoba Counties often worked together. On one occasion, Miller testified that he and Killen met at the Longhorn with Neshoba County Sheriff Lawrence Rainey,[13] and Neshoba County Deputy Sheriff Cecil Price,[14] to discuss how to "keep some Negroes from playing baseball in Philadelphia."

*The Klan targets Schwerner*

¶20. Schwerner, who was referred to by the Klan as "Goatee," became the subject of discussions at Klan meetings. Dennis testified that, at an early April Klan meeting, someone suggested the elimination of "Goatee," and Killen responded that they were "not yet

---

[11]The Imperial Wizard was the statewide leader of the Klan.

[12]Bowers was found guilty in the 1967 federal trial.

[13]Rainey was found not guilty in the 1967 federal trial.

[14]Price was found guilty in the 1967 federal trial.

9

organized as a Klavern and it would not be necessary for a local Klavern to approve that project . . . ." Killen further stated "that [the elimination] had already been approved by the state officers of the Klan and had been made a part of their program, and it would be taken care of."

¶21. Later, Killen and Herndon were in charge of another Klan meeting in Meridian where several members discussed whipping Schwerner. Miller testified that Killen "told us to leave him alone, that another unit was going to take care of him, that his elimination had been approved" by the Imperial Wizard.

*The burning of the Mt. Zion Church*

¶22. Around Memorial Day of 1964, Schwerner and Chaney met with the members of Mount Zion Church in Neshoba County to seek permission to use the church facilities that summer for a school similar to the community center in Meridian. They also wanted to use the church facilities for training persons to help African-Americans register to vote.

¶23. A few weeks later, in mid-June, the Schwerners traveled to Oxford, Ohio, to attend a training session for workers and volunteers in the civil rights movement. It was there that the Schwerners met Goodman, who was a volunteer worker. Goodman would later decide to join the Schwerners and Chaney in their work in Mississippi.

¶24. At approximately eight o'clock p.m. on June 16, Killen and several other members from Meridian attended a Klan meeting in an abandoned gym in Neshoba County. Approximately seventy-five Klansmen were present. Dennis testified that, after the meeting was called to order, Klansman Hop Barnett[15] interrupted to say that, on his way to the

---

[15]The jury in the 1967 federal trial was unable to reach a verdict as to Barnett.

10

meeting, "he had passed Mt. Zion Church, and there was a meeting being held, [which] must be an important meeting, because the Church was heavily guarded." Barnett said "he wanted to present what he had found to the group and see what they wanted to do about it." Dennis testified that, when Killen asked if the group thought that anything should be done about it, "[s]omeone suggested that there were probably some civil rights workers in the church, or it would not have been heavily guarded, and it was agreed that something would be done." Killen asked for volunteers to go to the church. Several men volunteered and left. When the men returned about an hour later, Klansman Billy Birdsong from Meridian reported to the group that the Meridian Klansmen had guarded one of the Church's exits while the Neshoba County Klansmen guarded the other. Birdsong angrily reported that all of the persons who came out of the exit guarded by the Meridian Klansmen were beaten, while those who came out the exit guarded by the Neshoba County Klansmen were not. Dennis said Birdsong "stated very heatedly that he disapproved of this, that he didn't like it at all. He thought that they should have been beaten." That night, the Mt. Zion Church was burned.

¶25. Two days later, on June 18, the Schwerners, Chaney, and Goodman received word in Ohio of what had happened at the Mt. Zion Church. They decided that Rita would remain in Ohio, and Schwerner, Chaney and Goodman would travel back to Mississippi to meet with the church members. On Saturday, June 20, Schwerner got up early, dressed, kissed Rita goodby, and left with Chaney and Goodman in the blue station wagon for Mississippi. This was the last time Rita would see her husband alive.

¶26. That evening, Schwerner called to tell Rita that they had arrived in Meridian and were planning to go to Philadelphia, in Neshoba County the next day. Goodman – either unaware

11

of the pending danger, or in an attempt to allay his parents' fears – sent a postcard home which stated,

> Dear Mom and Dad,
>
> I have arrived safely in Meridian, Mississippi. This is a wonderful town and the weather is fine. I wish you were here. The people in this city are wonderful and our reception was very good.
>
> All my love,
> Andy

*The murders – June 21, 1964*

¶27.  In the early afternoon on the day of the killings, Mississippi Highway Patrolman Earl Robert Poe went on duty in Neshoba County. At approximately three o'clock, he parked his patrol car under a tree about four miles east of Philadelphia on Highway 16. Deputy Sheriff Price, who was traveling east on Highway 16 in a blue, 1957 Chevrolet, passed Poe's vehicle. About fifteen minutes later, Price called Poe on the radio and said "he had a good one or [was] chasing a good one." Poe later learned that Price was chasing civil rights worker George Raymond. Poe (who was still parked under the same tree) later observed Price traveling west on Highway 16 behind a blue station wagon. Four or five minutes later, Price radioed Poe and requested assistance in arresting the occupants of the station wagon. Poe proceeded east on Highway 16, and met Price and the station wagon at the intersection of Beacon and Main Streets in Philadelphia. Schwerner, Chaney and Goodman were changing a flat tire on the station wagon. Price told Poe he had arrested Chaney for speeding and requested assistance in transporting the three to jail. Poe's partner, patrolman Wiggs, took Chaney in the station wagon and Poe took Schwerner and Goodman. Price took charge

12

of the three men at the jail and had them locked up between three-thirty and four o'clock. Poe testified that he did not learn until later at the Philadelphia police station that the three men they had just arrested were the three civil rights workers – Schwerner, Chaney and Goodman. Poe said Price asked him to check the tag number of the station wagon and get a registration. Poe ran the license plate number, which was H-25503, and learned the station wagon belonged to the Congress of Racial Equality.

¶28. Minnie Lee Herring and her husband operated the Neshoba County Jail, where they also lived. She remembered that Price brought Schwerner, Chaney, and Goodman to the jail at around four o'clock.

¶29. Killen received word on June 21, 1964, that Schwerner, Chaney and Goodman had been arrested. Killen went to Meridian and met with Herndon at the Longhorn where they made several calls on the pay phone. Killen told Miller that they then "got some boys together and went to Philadelphia."

¶30. At around six o'clock, James Jordan went to the Longhorn to pick up his wife, who was working there at the time. When he arrived, several Klan members were there including Herndon, who had administered the Klan oath to Jordan. Later, Killen arrived at the Longhorn and went in to talk with Herndon. Jordan testified that, when Killen came out from his meeting, he said "he had a job he needed some help on over in Neshoba County, and he needed some men to go with him." Killen also informed them that "three of those civil rights workers were locked up, and they needed their rear-ends tore up." Killen identified one of the civil rights workers as "Goatee," who Jordan testified he knew to be Schwerner.

13

Some of the men began using the phone at the Longhorn to recruit help, and while others went down the street to Akin Mobile Homes to use the phone there.

¶31.    As the men were preparing to leave for Neshoba County, Killen instructed Jordan to get some of the men they had not been able to reach by telephone.  Jordan was able to recruit Wayne Roberts,[16] and they left to join the men who had gathered at Akin's Mobile Homes. Jordan testified that, when they arrived, "Mr. Akin[17] was there, Pete Harris, myself, Wayne at that time.  Then he said there would be some more boys on their way, [and] they arrived in just a few minutes."  They were joined by Travis and Doyle Barnette, Jimmy Snowden, and Jimmy Arledge."[18]  Jordan testified that Killen, who was also there, said to the men that "they had three of the civil rights workers locked up, and we had to hurry and get over there, and we were to pick them up and tear their butts up."  Killen also said that "a Highway Patrol car would stop [the three civil rights workers] on the outskirts of town."

¶32.    Killen then sent Jordan, Sharp and Wayne Roberts to get some gloves.  They returned with the gloves and gassed up their cars.  Then, according to Jordan's testimony, Killen "said he would go ahead, as he had to get on back there as fast as he could and make the arrangements, there were several cars coming in, and these guys couldn't be held much longer."  Killen then left with Sharpe and Wayne Roberts.  Jordan testified he "left with Doyle and Travis, Jimmy Arledge, and Jimmy Snowden," and headed for the "far side of the

---

[16] According to Jordan's testimony, Roberts was the triggerman who killed Schwerner, Chaney and Goodman.  Roberts was found guilty in the 1967 federal trial.

[17]Bernard L. Akin was found not guilty in the 1967 federal trial.

[18]Horace Doyle Barnette, Snowden, and Arledge were three of the seven defendants found guilty in the 1967 federal trial.  Travis Barnette was found not guilty.

14

courthouse" in Philadelphia, where Killen had told them to park and wait for further instructions." When they arrived, Barnette "was standing out there beside his pickup truck." Barnette said he had to leave, but they were to wait for further instructions. Jordan testified that, after Barnette left, Killen "came from around the corner, told us that he would take us by and show us the jail, and then we would be told where to wait until [Schwerner, Chaney and Goodman] were released." Killen then took them by to show them the jail, and had them drive to a spot behind an old warehouse where he told them they were to wait. After he showed them the place they were to wait, Killen then instructed the men to take him to a funeral home in Philadelphia. According to Jordan, Killen explained to the men that he needed to be seen at the funeral home "because if anything happened, he would be the first one questioned." After delivering Killen to the funeral home, Jordan and the other men returned to the spot behind the warehouse to wait.

¶33. Mrs. Herring testified that the following events took place at approximately ten-thirty that night:

> Well, Price came into the jail and up in the hall to our quarters at ten-thirty and said, "Mr. Herring, Chaney wants to pay off," and he said, "We'll let him pay off, and we'll release them all." Well, my husband opened the door, and he walked around. The white boys were in the front cell, and the colored boy was on the back, so he walked around the bars and asked the colored boy if he wanted to pay off, and Chaney asked him how much it was, and he told him it would be twenty dollars. Well, he didn't have the twenty dollars on him, so he borrowed it from Schwerner and paid the fine, and, so, my husband wrote the receipt, and Cecil went back and unlocked the combination and let them out and walked on out in the little hall. He had their belongings in a little box, and I had their driver's license, so each one of them reached in and got their billfolds and put their driver's license in their billfolds, and my husband gave them the receipt, and Price told them, "See how quick you all can get out of Neshoba County," and they thanked him and went on out.

15

¶34.   The men waiting behind the warehouse learned that Schwerner, Chaney and Goodman had been released from jail when, according to Jordan's testimony, "a city police car [sic] came up and said, 'they're going on Highway 19 toward Meridian. Follow them.'" The men drove out Highway 19 toward Meridian behind a red Chevrolet driven by Billy Wayne Posey.[19]

¶35.   When they reached the outskirts of Philadelphia, Posey pulled over beside a Highway Patrol car, and the car in which Jordan was riding pulled up behind. Jordan testified that Posey got out and talked with the driver of the Highway Patrol car, and then "he walked back to our car and said, 'Never mind. They will be stopped by the Deputy Sheriff. These men are not going to stop them.'" About that time, Deputy Price came by, said something to Posey (which Jordan couldn't hear), and then drove off. Deputy Price was followed by Posey, and the car Jordan was in "took off to follow them." When Posey's car broke down, he got in the car with Jordan, and they proceeded at a high rate of speed to catch up with Deputy Price. When they caught up with him, he had "a little wagon" pulled over to the side of the road. Jordan testified that Price "got out and went up and told the three men that were in the car to get out." Price ordered the three men into the back seat of his patrol car, and they drove back toward Philadelphia.

¶36.   They turned left onto a graded clay road. Jordan testified that he got out of the car "to watch and see if anything was happening. The other cars proceeded on up this road." Jordan then testified, "Well, I heard a car door slamming, and some loud talking. I couldn't understand or distinguish anyone's voice or anything, and then I heard several shots." Jordan

---

[19]Posey was found guilty in the 1967 federal trial.

walked up the road and saw Schwerner, Chaney and Goodman lying dead beside the road.[20] The men put the three bodies into the back of the station wagon and drove to the site of a dam construction where the men waited for a bulldozer operator named "Herman" to arrive. When Herman arrived, he cranked up the bulldozer and buried Schwerner, Chaney and Goodman in the dam.

¶37.    The men then drove back to Philadelphia to a warehouse. Everyone gave Jordan their gloves and told him to get rid of them. They then went to a parking lot in Philadelphia where they met up with Deputy Price and some other men. Posey got out and went over to talk, and then returned and told the men in the car to go home, "that everything would be taken care of."

¶38.    About midnight, Rita (who was still in Oxford, Ohio) was awakened by a knock at her door. She was asked to go to the office, where she was told that her husband, Chaney and Schwerner had not returned to Meridian from their trip to Philadelphia.

*June 22, 1964 – Killen admits his participation*

¶39.    The next day, Hatcher was at City Court in Meridian, when he got word to go to an automotive repair shop where he worked part time because someone wanted to see him. When he arrived, he was told that Killen was outside and wanted to see him. Killen asked him to deliver a gun to someone, and Hatcher agreed. Then, Hatcher testified that Killen said "we got rid of those Civil Rights workers, and you won't have no more trouble out of Goatee." Hatcher then testified that Killen said that

---

[20]Jordan testified that the men present at that time were "Travis and Doyle Barnette, the deputy Sheriff and myself, and Jimmy Snowden, and Jimmy Arledge, and Wayne Roberts . . . and Sharpe." The jury in the 1967 federal trial was unable to reach a verdict as to Jerry McGrew Sharpe.

they was stopped on Highway 19, and they had some trouble. One of the people who was supposed to be in on it, car broke down, and two Highway Patrol was supposed to be involved in it. I don't remember what their names was. But they backed out, and they ended up shooting them and killing them and buried them in the middle of a pond dam out here off of Highway 21 where a pond dam was being built. They were buried in a shallow grave, and that the bulldozer operator, who I believe he told me was a Tucker,[21] got there the next morning to cover them up, and then two workers showed up early and found some blood there or something, and they had to get out there and get them other two people swore in and sworn to secrecy and threatened, so they wouldn't tell, and they covered them up under that pond dam. He told me the car was supposed to have been covered up too, but the trouble they had or something with it, and he was worried about them finding it, and he told me that he was at the funeral home, signed the book, made sure he talked to people in front and rear of him, and that was his alibi, and I told him, well, good.

¶40. When asked what he did as a result of receiving this information, given that he was a Meridian police officer, Hatcher testified, "Well, I thought about it, wasn't really worried about it, and then later on, I took the firing pin out of the gun." Hatcher later heard that various people were giving information to the FBI. He testified:

I was told by the Police Department it's time for you to go tell what you know, cooperate with the FBI before you get in an embarrassing situation and you lose your job, which I didn't want to do. So, then I went and started telling the FBI, and I believe this was after the bodies had been found before I did that, talked to the FBI.

Hatcher testified he neither asked for, nor received, any pay for his cooperation with the FBI.

¶41. Miller testified that, sometime in June after the deaths of the civil rights workers, Killen came to his home and said that "they had been shot, that they were dead, and that they were buried in a dam about fifteen feet deep, and [Killen] told me that Deputy Price told the FBI the truth about what time [Deputy Price] turned them out." Miller also testified that, in

---

[21]Herman Tucker was found not guilty in the 1967 federal trial.

that same meeting, Killen told him that "they burned the [Mount Zion] Church to get the Civil Rights workers up there, referring to Schwerner."

*The investigation*

¶42. Because of the difficulty in obtaining information from the public and the lack of cooperation from local law enforcement, the FBI hired numerous informants in Mississippi, some of whom were in the Klan. One of the informants provided information about the location of the Schwerners' station wagon. On June 23, John Proctor, who was the resident agent in Meridian, met Special Agent Dean Lytel[22] and several other Special Agents in Philadelphia. Proctor took the agents out Highway 21 to a place called Bogue Chitto Creek, in Neshoba County, where they found the badly burned blue Ford station wagon hidden about seventy-five to a hundred feet off the road. The agents searched the area, but were unable to locate any clues. When they returned to Philadelphia, they met in the Neshoba County Courthouse with Sheriff Rainey and a Captain from the State Police. When the agents left the meeting at approximately ten o'clock that night, a crowd had gathered. Special Agent Lytel described the scene as follows:

> We went out the front door of the Courthouse, and the square was filled with people. The people were shoulder to shoulder on two sides of the Courthouse, and the crowd was a very hostile crowd, with catcalls and boos, and Inspector Sullivan at that time told us that we should all get in our cars and stay close together, and we would leave town as a caravan, because he was concerned about the safety of the agents.

---

[22]Special Agent Lytle worked out of the New Orleans office of the FBI, but during 1963 and 1964, he was assigned to numerous cases in Mississippi investigating civil rights cases, including church burnings.

¶43. On July 31, FBI Special Agent Jay Cochran, Jr., was informed that the FBI had received information that "the three civil rights workers were buried in an earthen dam under twelve to fourteen feet of earth on a farm known as the Old Jolly Farm in Neshoba County." The Old Jolly Farm was located southwest of Philadelphia off Highway 21. The FBI had very specific information about where the bodies were buried. They hired a construction crew to dig where they had been told the bodies were buried, and at approximately three o'clock that afternoon, they uncovered Schwerner's body. Over the course of the next few hours, the bodies of Goodman and Chaney were also uncovered. The parties stipulated that Schwerner died as a result of a gunshot wound to the chest; Chaney died as a result of a gunshot to the head; and Goodman died as a result of a gunshot wound to the chest.

*Killen's second admission of his participation*

¶44. During 1967, Odell Rush regularly took his grandson, Mike Winstead, to church at the Pine Grove Baptist Church, where Rush was a Sunday School teacher. The church was located in the House community, on Highway 19, between Philadelphia and Meridian. Winstead knew who Killen was "just from living around the community" and because "his brother was married to one of [Winstead's] cousins." One Sunday morning after Sunday School ended and Church was beginning, people in the congregation turned around to watch Killen come in the Church and sit on the back pew. Even though Winstead was only ten years old at the time, he testified[23] his memory of the events that day was vivid. Winstead stated:

---

[23]Winstead was called by the State to testify live at Killen's 2006 trial.

to me it was just like somebody would say Matt Dillon just walked in, because, you know, I had heard the name around. I had heard the adults talking around all this that had went on. You know, I was a kid, curious about, you know, this name, this person. People said that Edgar Ray just came in, and people were turning around looking, and I looked to the back and seen him sitting on the back pew.

¶45. Later that afternoon, Killen went to Rush's house. They were sitting on the front porch talking, and Winstead overheard part of the conversation. When asked what he heard, Winstead testified:

> The only thing I remember about the conversation that struck my mind, that stayed in it, I don't know if I just wasn't paying attention [to] the conversation at the time, my grandfather asked Edgar Ray if he had anything to do with those boys being killed, and he told my grandfather, yes, and he was proud of it.

¶46. In October, 2004, while serving a prison term[24] in Jefferson County, Winstead came forward with the information about Killen's conversation with his grandfather. Winstead testified he neither asked for, nor received, anything for his testimony.

¶47. On January 4, 2005, a Neshoba County Grand Jury returned a three-count indictment charging Killen with the three murders. Killen's trial began on June 13, and on June 21, 2005, the Neshoba County jury found him guilty on three counts of manslaughter. On June 23, Circuit Judge Marcus Gordon sentenced Killen to serve twenty years for each count, with the three sentences to run consecutively, for a total sentence of sixty years.

¶48. Following the trial, Killen filed post-trial motions which were denied on June 27. He now appeals, claiming that the pre-indictment delay in bringing him to trial denied him due

---

[24]The crime which led to Winstead's imprisonment was unrelated to Killen.

process of law and that the circuit court committed reversible error by allowing the jury to consider manslaughter as a lesser-included offense of the murders for which he was indicted.

## II.

¶49.    Killen's first assignment of error is that the trial court erred in granting the State's request for jury instructions on manslaughter. The State offered three instructions related to a lesser-included offense of manslaughter, and Killen's counsel objected to all three. The first of these three was Jury Instruction S-6, which stated:

> If the State has failed to prove all of the essential elements of the crime of Murder, you may consider the lesser charge of Manslaughter. However, it is your duty to accept the law given to you by the Court; and if the facts and the law warrant a conviction of the crime of Murder, then it is your duty to make such finding uninfluenced by your power to find a lesser offense. This provision is not designed to relieve you from the performance of an unpleasant duty. It is included to prevent failure of justice if the evidence fails to prove the original charge but does justify a verdict for the crime of manslaughter.

Killen's counsel objected to this instruction, stating:

> Now, they are charging in here that he committed the act of kidnaping. I am going to object to this one right now because the proof does not show that he was doing anything else, either guilty of murder or not guilty of murder, and they charge in another instruction here, saying he would be guilty of kidnaping. Now kidnaping, under Section 97-3-51, that's removal of a child aged fourteen by a non-custodial parent. I couldn't find anything else on kidnaping.
>     Secondly, there's a statute of limitations on kidnaping. There's a two year statute of limitations on it, and I'm going to cite the Code section if I may, Your Honor. That's Section 99-1-5. Now, 99-1-5 states the limitations on prosecution, and it names several of them in there, and includes murder and manslaughter and arson and a lot more other crimes there's a time limitation. All others are two years, and they never name kidnaping in that statute, Judge. So, the statute of limitations is two years on kidnaping.
>     In other words, they are going to have to show there is a kidnaping and that when he kidnaped him, he accidentally killed him, killed these three Civil Rights workers, but they can't get kidnaping in because the statute of limitations has run on it, and, number two - -

22

*   *   *

Secondly [sic], Your Honor, there is no definition of manslaughter in the Code.

*   *   *

We feel like the jury may compromise. Get up there and say, well, he's not guilty of murder and then they come together and compromise. We feel like our defense is stronger than the prosecution.

¶50.  After hearing these objections to Jury Instruction S-6, the trial judge stated: "All right.

S-6 is given. What do you say to S-7? Jury Instruction S-7 stated:

Every killing of a human being without authority of law is either murder or manslaughter. It is murder when done with a deliberate design to cause the death of the person killed, and it is manslaughter when the killing is done in the heat of passion, without malice and without any premeditation.

Killen's counsel responded to this instruction by stating:

Well, manslaughter is done with killing in the heat of passion. There's been no testimony whatsoever that he was even there and put him there at the scene. He could not have killed anybody in the heat of passion, because you've got to be there to do it.

¶51.  The trial judge stated he would give S-7, and then asked about S-8, which read:

If the State has failed to prove all of the essential elements of the crime of Murder, you may consider the lesser charge of Manslaughter. The Court instructs the jury that as to Count One of the indictment, if you find from all the evidence in this case beyond a reasonable doubt that:

1.  the deceased, Michael Schwerner, was a living person;

2.  Edgar Ray Killen on or about June 21, 1964, in Neshoba County, Mississippi, did willfully, unlawfully, feloniously and without malice kill Michael Schwerner while the defendant was engaged in the commission of, or the attempt to commit, the felony crime of kidnaping; and

3.  the killing was without authority of law and not in necessary self defense.

23

Then you shall find the defendant guilty of manslaughter in Count One.

After addressing counts two and three similarly, the instruction went on to state:

Now for you to find that the defendant was engaged in or attempting to commit the offense of kidnaping, you must find from all the evidence in this case beyond a reasonable doubt that the defendant:

1.  in Neshoba County, Mississippi, on or about June 21, 1964, did willfully and without lawful authority, forcibly seize and confine the said Michael Schwerner, James Chaney and Andrew Goodman against their will; and

2.  did then and there unlawfully remove the said Michael Schwerner, James Chaney and Andrew Goodman from a place where they had a lawful right to be, to another place, with the intent to cause such persons to be secretly confined against their will, or to be deprived of their liberty.

¶52. Killen's counsel objected to this instruction by stating, "That's the kidnaping statute on manslaughter. My same arguments." The trial judge then stated, "It's given."

¶53. No other instructions related to manslaughter were given. After the trial court instructed the jury and counsel made their closing arguments, the jury retired, deliberated, and returned a verdict of "guilty" on all three counts of manslaughter.

*Lesser-included offense argument.*

¶54. On appeal, Killen first raises an argument not raised to the trial court prior to submission of the instructions to the jury. Killen says that "any lesser offense not 'included' in the greater, charged offense, is not one which was 'presented' by a grand jury, and hence may not be the subject of a conviction, or consequently, of a jury instruction as to the conviction in the case subjudice."

24

¶55.    The State responds that Killen is procedurally barred from arguing on appeal that manslaughter is not a lesser-included offense of murder. The State supports its argument by pointing out that Killen made two specific objections to the giving of the manslaughter instruction, and that he is limited here to the grounds he asserted to the trial court. Upon review of the record, however, we find that Killen's counsel actually made three objections[25] to the manslaughter instructions: (i) that kidnaping required "removal of a child aged fourteen by a non-custodial parent," (ii) that the statute of limitations on kidnaping had run, and (iii) that no kidnaping occurred.

¶56.    This Court has strictly enforced the rule that, in order to preserve a jury instruction issue for appellate purposes, a defendant must make specific, on-the-record objections to proposed instructions. In ***Morgan v. State***, 741 So. 2d 246 (Miss. 1999), this Court held:

> In order to preserve a jury instruction issue on appeal, a party must make a specific objection to the proposed instruction in order to allow the lower court to consider the issue. (internal citation omitted). Further, "[a]n objection on one or more specific grounds constitutes a waiver of all other grounds." ***Stringer v. State***, 279 So. 2d 156, 158 (Miss. 1973). *See also **McGarrh v. State***, 249 So. Miss. 247, 276, 148 So. 2d 494, 506 (1963) (objection cannot be enlarged in reviewing court to embrace omission not complained of at trial).

741 So. 2d at 253. *See also **Rubenstein v. State***, 941 So. 2d 735, 801 (Miss. 2006); ***Harris v. State***, 861 So. 2d 1003, 1017 (Miss. 2003); ***Ballenger v. State***, 667 So. 2d 1242, 1256 (Miss. 1995). We see nothing that distinguishes this case from our holding in ***Morgan***. Thus

---

[25]Killen also suggested that only he had the right to seek an instruction on a lesser-included offense. However, this Court has stated that Mississippi law "allows the prosecution to request and obtain lesser-included offense instructions, as it does the defense." ***Harveston v. State***, 493 So. 2d 365, 375 (Miss. 1986).

25

Killen's argument that the manslaughter instruction was not a lesser-included offense of murder, is procedurally barred.

*Evidence supporting manslaughter.*

¶57.    Next, Killen argues that the manslaughter instruction should not have been given because (1) there was no evidence of a kidnaping, (2) there was no proof that Killen participated in the killing "in the heat of passion, without malice and without premeditation," and (3) the statute of limitations had run on kidnaping.

¶58.    It is well established that jury instructions must be supported by the evidence, ***Smith v. State***, 835 So. 2d 927, 937 (Miss. 2002), and we find the record replete with evidence that there was a kidnaping, and that Killen planned and participated in it.

¶59.    Under the statute in effect in 1967, kidnaping was defined as the seizure or confinement of another person against his or her will, without lawful authority with the intent to deprive such person of his or her liberty.  *See* Miss. Code Ann. § 2238 (1942) (now codified as Miss. Code Ann. § 97-3-53 (Rev. 2006)).  Jordan testified that, after Schwerner, Chaney and Goodman were locked up in the jail in Philadelphia, Killen met with Herndon and others at the Longhorn in Meridian at around six o'clock, and told them that "he [Killen] had a job and he needed some help over in Neshoba County, and he needed some men to go with him."  Killen also informed them that "three of those civil rights workers were locked up, and they needed their rear-ends tore up."  Killen identified one of the civil rights workers as "Goatee," who Jordan testified he knew to be Schwerner.  Jordan also testified that Killen later said, "they had three of the civil rights workers locked up, and we had to hurry and get

26

over there, and we were to pick them up and tear their butts up." Killen also said that "a Highway Patrol car would stop [the three civil rights workers] on the outskirts of town."

¶60. Furthermore, Jordan testified that it was Killen who sent Jordan, Sharp and Wayne Roberts to get some gloves, after which Killen said "he would go ahead, as he had to get on back there as fast as he could and make the arrangements, there were several cars coming in, and these guys couldn't be held much longer." According to Jordan, Killen showed him and the other men where to park and "wait until [Schwerner, Chaney and Goodman] were released." Jordan and the men waited, as instructed by Killen, until Schwerner, Chaney and Goodman were released from jail and drove away in the station wagon. They then fell in behind the station wagon and were present as Price placed them in his patrol car and took them to a secluded area. Jordan stood watch as the three men were killed.

¶61. In the face of this testimony, Killen's argument that there was no evidence he participated in a kidnaping is completely lacking in merit.

*Heat of passion without malice.*

¶62. Killen also argues that there was no evidence that Schwerner, Chaney and Goodman were killed in the heat of passion without malice. However, the record reflects that Killen's instruction to the Klan members who were to assist in grabbing Schwerner, Chaney and Goodman was to "pick them up and tear their butts up." Further, testimony indicated that Killen asked to be dropped off at the funeral home because *if anything happened*, he knew that he would be the first person questioned by authorities. The jury could certainly have found that Killen planned the abduction of the three men and that he intended that they be

27

whipped or beaten, but that he did not intend for them to be killed. Thus, this argument has no merit.

*Statute of limitations.*

¶63. The third reason Killen argues we should reverse based upon the manslaughter instruction is that the statute of limitations had run as to the underlying crime of kidnaping. Killen's counsel repeatedly argued to the trial judge that the State was "charging [Killen] with kidnaping." In response, the trial judge appropriately pointed out that Killen was not being "charged" with kidnaping, but the state was merely attempting to "define" kidnaping as the underlying crime to the lesser-included offense of manslaughter.[26]

¶64. Killen cites authority that stands for the proposition that a conviction of a lesser-included offense is not permitted where the statute of limitations has run on the lesser-included offense. *See Riggs v. State*, 30 Miss. 635, 647 (1856) (simply stating that the jury could not convict the defendant of a lesser-included offense where the statute of limitations had run on the lesser-included offense). However, kidnaping was not the lesser-included offense in this case, but was used only to establish an element of the lesser-included offense, which was manslaughter. Since the statute of limitations had not run on manslaughter, the statute of limitations had not run on the lesser-included offense, and *Riggs* is therefore inapposite. *See also McGowan v. State*, 200 Miss. 270, 25 So. 2d 131 (1946) (finding

---

[26] The State offered the instruction based upon the felony manslaughter statute that was in existence in 1964 which defined manslaughter as the "killing of a human being without malice by the act, procurement or culpable negligence of another, while engaged in a perpetration of any felony, except rape, burglary, arson, or robbery, or while such other is attempting to commit any felony . . . ." The State used kidnaping as the underlying felony. Miss. Code Ann. § 2220 (1942).

28

indictment for a second-offense crime does not cause the charge to be barred by the statute of limitations by referring to former offense which was barred by the statute of limitations).

¶65.    Killen was convicted of the lesser-included offense of manslaughter.  There is no statute of limitations on manslaughter in Mississippi;  therefore, the statute of limitations could not have run.  Thus, Killen's argument is without merit.

**III.**

¶66.    The second issue presented by Killen is whether the delay of forty-one years in bringing the indictment denied him due process of law.  Killen first attempted to persuade the trial court to quash the indictment by arguing that the State violated his Sixth Amendment right to a speedy trial.  However, upon being reminded by the State at the motion hearing that the delay of which he complained was pre-indictment, and that the trial took place only five months following the indictment, Killen conceded that his claim was not a violation of the Sixth Amendment, but rather of the Fifth Amendment.

¶67.    The State of Mississippi did not bring charges against Killen until 2005, some forty-one years following the deaths of Schwerner, Chaney, and Goodman.  Killen argues that the State's delay was intentional and resulted in actual prejudice to him.  Specifically, Killen claims that the State intentionally used delay to obtain a tactical advantage, pointing to the change of the political climate in Mississippi in 2005 as compared to 1964, so that a jury was much more likely to convict him in 2005.  Killen argues that he suffered actual prejudice by the forty-one year delay, in that he was eighty years old at the time of the trial, in poor health and many witnesses had died or their memories had failed.  The State responds that the delay was not intentional and that the delay failed to result in actual prejudice to Killen.

29

¶68. The United States Supreme Court noted in *United States v. Lovasco*, 431 U.S. 783, 790, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977), that, in making the determination as to whether a defendant's due process rights have been violated, courts "are not free . . . to impose on law enforcement officials our 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.'" 431 U.S. at 790 (*quoting Rochin v. California*, 342 U.S. 165, 173, 72 S. Ct. 205, 96 L. Ed. 183 (1952)). The Court further stated that courts "are to determine only whether the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), and which define 'the community's sense of fair play and decency'." *Lovasco*, 431 U.S. at 790 *(quoting Rochin*, 342 U.S. at 173).

¶69. This Court has previously stated "in a pre-indictment analysis of due process violations that the burden of persuasion is on the defendant." *Stack v. State*, 860 So. 2d 687, 700 (2003) (*citing Hooker*, 516 So. 2d 1349, 1351 (Miss. 1987)). In order to analyze claims of due process violations for pre-indictment delay in bringing prosecutions, the United States Supreme Court set forth the two-prong test in *United States v. Marion*, 404 U.S. 307, 324, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971), and *Lovasco*, 431 U.S. at 795–96. This Court adopted the two-prong test in *Hooker*, which held that in order for a defendant to prevail on such a claim there must be a showing that (1) the pre-indictment delay prejudiced that defendant, and (2) the delay was an intentional device used by the government to obtain a tactical advantage over the accused. *Hooker*, 516 So. 2d at 1351.

*Prejudice.*

30

¶70. Killen argues that the following factors have caused him actual prejudice due to the forty-one-year, pre-indictment delay: (1) he is now eighty years of age and has deteriorated in mind and body; (2) he was sick and in severe pain from injuries received from a falling tree; (3) witnesses had died and memories had failed; (4) he could not be judged by his peers as they had long passed away or were too old to serve on juries; and (5) he suffered from high blood pressure and was on blood pressure medication.

¶71. With regard to Killen's claims that the pre-indictment delay caused him actual prejudice due to his old age, ill health and inability to be judged by a jury of his peers, Killen cites no legal authority for these claims in his brief. Killen merely asserts that at the time of the 2005 trial, he was eighty years old, in poor health, suffered from high blood pressure[27] and could not be judged by his peers. Because Killen cites no authority that these factors are sufficient to constitute actual prejudice, we hold that these factors warrant no consideration. *See Cleveland v. Mann*, 942 So. 2d 108, 115 (Miss. 2006) (*citing Ferrell v. River City Roofing, Inc.*, 912 So. 2d 448, 456 (Miss. 2005)) (this Court's obligation to review the issue ceases upon party's failure to cite relevant authority).

¶72. Killen also claims that he suffered actual prejudice due to deceased witnesses and deteriorated memories. In a case very similar to the case at bar, this Court analyzed whether a twenty-one year, pre-indictment delay violated the due process rights of defendant Byron

---

[27]The record reflects that Killen was physically present throughout his trial. In fact, during one point of the trial, Killen was taken to the hospital due to high blood pressure. When the judge indicated that, in Killen's absence, he would like to proceed with the trial with the reading of transcript testimony, Killen's attorney stated that he did not feel comfortable without first getting his client's permission because Killen "tries to run the defense." Because Killen refused to consent, the trial judge recessed the trial until the next morning when Killen could be present. Thus, we find no merit to Killen's argument that he was too ill or deteriorated to assist in his defense.

De La Beckwith ("Beckwith"). Beckwith was initially charged for the murder of Medgar Evers, first Field Secretary for the NAACP in Mississippi, who was shot in the back on the front steps of his family home in Jackson, Mississippi. *Beckwith v. State*, 707 So. 2d 547, 555 (Miss. 1997). Beckwith was tried twice for the murder in 1964, but both trials ended in mistrials. *Id*. at 568. Following the mistrials, a *nolle prosequi* was entered in 1969. *Id*. No further action was taken against Beckwith until some twenty-one years later, when the State of Mississippi re-indicted him in 1990. *Id*. Beckwith was tried and convicted in 1994 and sentenced to a life term. *Id*. Beckwith appealed his conviction. A due process violation claim for the twenty-one-year, pre-indictment delay was among the many issues on appeal before this Court. *Id*.

¶73. Beckwith asserted similar claims of "deceased witnesses" and "faded memories" as a basis for his due process argument. *Id*. at 570. This Court stated, "[w]itnesses for both the state and the defense [have] died in the interim between the trials, but testimony from previous trials was available and was read to the jury." *Id*. This Court further noted that "Beckwith did not put into the record any facts he could have proved by these deceased witnesses that did not go to the jury through their prior testimony." *Id*.

¶74. Similarly, Killen has failed to show how he was prejudiced in this regard. All six of Killen's witnesses testified live at his 2005 trial, and he has not suggested any witness he was unable to call on his behalf as a result of the forty-one- year delay. Further, the testimony in the record does not indicate that Killen's witnesses failed to remember the events of 1964. In fact, Killen's sister testified in detail about the events that took place on June 21, 1964, when she and her siblings, including Killen, gathered at their parent's home for Sunday

32

dinner. Killen's brother also testified in detail about the family gathering at the Killen home on the afternoon of June 21, 1964. He also testified that Killen was present at the funeral home around seven or eight o'clock on the evening of June 21, 1964. Killen's other witnesses similarly had no problems recalling the events that took place in 1964.

¶75. Of the State's fourteen witnesses at the 2005 trial, six were called by transcript and eight testified live. Killen, through his counsel, had the opportunity to cross-examine all of the State's witnesses at both trials. This Court has stated that "[v]ague assertions of lost witnesses, faded memories, or misplaced documents are insufficient to establish a due process violation from preindictment delay." *Beckwith*, 707 So. 2d at 570 (*citing United States v. Harrison*, 918 F.2d 469, 474 (5th Cir. 1990)); *United States v. Ballard*, 779 F.2d 287, 294 (5th Cir. 1986). Accordingly, we find that Killen has failed to meet his burden of proving actual prejudice and hold that the trial court did not err in finding Killen suffered no actual prejudice as a result of the forty-one-year delay.

*Intentional Delay Used to Obtain a Tactical Advantage.*

¶76. Having found no actual prejudice, we need not address the reasons for the delay, as a due process violation requires both a showing of actual prejudice *and* intentional delay. *Hooker*, 515 So. 2d at 1351. In other words, where a defendant fails to show actual prejudice resulting from a claimed due process violation, the inquiry ends, and the reason for the delay need not be addressed. However, in the interest of completeness, we shall address Killen's argument that the State's delay was an intentional device used to obtain a tactical advantage.

33

¶77. Killen argues that the State intentionally delayed prosecution to obtain a tactical advantage. Specifically, Killen tells us in his brief:

> This Court could take judicial notice that jurors and jury duty has materially changed since the sixties; that the political climate in Mississippi had completely reversed in 2005 from the sixties. It would be foolish to argue that the attitude of the general public has not changed from the sixties all to the advantage of the State and to actual prejudice against the Appellant.

¶78. As we understand this argument, Killen would like us to take judicial notice that, had he been prosecuted in the 1960s, he likely would have drawn an all-white jury, the members of which would probably have been reluctant to convict a white man whose only crime was doing harm to a black man (Chaney) and two white civil rights workers (Schwerner and Goodman). Stated another way, Killen argues that – because of the low regard for the civil rights of African-Americans held by white juries and politicians in 1964 – he was far less likely to have been convicted in a 1964 trial.

¶79. We cannot say Killen's premise is inaccurate, that is, that "jurors and jury duty has materially changed since the sixties; that the political climate in Mississippi had completely reversed in 2005 from the sixties," and that "the attitude of the general public" has "changed from the sixties." That said, however, Killen cites no authority for the proposition that he may satisfy *Hooker's* actual prejudice requirement by demonstrating he was denied a trial in a prejudiced "political atmosphere" before a prejudiced "jury" selected from the virtually all-white voter rolls used to select persons for "jury duty." We shall say no more than to add that we find this argument has no merit, and we are surprised it is made.

¶80. In summary, we note that this Court has previously stated "where there [is] no bar to prosecution by an applicable statute of limitations, 'the constitution places a heavy burden

34

on the defendant to show that the pre-indictment delay has offended due process.'" ***Beckwith***, 707 So. 2d at 570 (*quoting **Stoner v. Graddick***, 751 F.2d 1535, 1540 (11th Cir. 1985)) (court rejecting defendant's due process claim despite no reason given by the state for the revival of the 19-year-old case). Killen has not met this burden. Therefore, the trial court did not err in denying Killen's motion to quash the indictment based on a due process violation.

¶81. Finding no merit to either of the assignments of error, we affirm the judgment of the Circuit Court of Neshoba County, both as to Edgar Ray Killen's conviction of three counts of manslaughter, and the trial court's sentence of twenty years for each count, with the sentences to run consecutively.

¶82. **COUNT I: CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**COUNT II: CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE IN COUNT II SHALL RUN CONSECUTIVELY TO THE SENTENCE IMPOSED IN COUNT I.**

**COUNT III: CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE IN COUNT III SHALL RUN CONSECUTIVELY TO THE SENTENCES IMPOSED IN COUNTS I AND II, OR A TOTAL OF SIXTY (60) YEARS TO SERVE.**

**SMITH, C.J., WALLER AND COBB, P.JJ., DIAZ, CARLSON, GRAVES AND RANDOLPH, JJ., CONCUR. EASLEY, J., NOT PARTICIPATING.**